PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FRIENDS OF BACK BAY; BACK BAY
RESTORATION FOUNDATION, LTD.,

        *Plaintiffs-Appellants,*

v.

UNITED STATES ARMY CORPS OF
ENGINEERS; JOHN MCHUGH, in his
official capacity as Secretary of
The Army; ROBERT L. VAN
ANTWERP, Lieutenant General, in
his official capacity as Chief of
Engineers and Commanding
General of the U.S. Army Corps
of Engineers; ANDREW W. BACKUS,
Colonel, in his official capacity as
District Engineer of the U.S.
Army Corps of Engineers, Norfolk
District,

        *Defendants-Appellees.*

No. 11-1184

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., Senior District Judge.
(2:10-cv-00270-HCM-TEM)

Argued: January 25, 2012

Decided: June 18, 2012

Before KING, GREGORY, and FLOYD, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Gregory and Judge Floyd joined.

---

**COUNSEL**

**ARGUED:** Deborah M. Murray, SOUTHERN ENVIRON-MENTAL LAW CENTER, Charlottesville, Virginia, for Appellants. Brian C. Toth, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Ignacia S. Moreno, Assistant Attorney General, Environment & Natural Resources Division, Katherine J. Barton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

**OPINION**

KING, Circuit Judge:

Friends of Back Bay, together with Back Bay Restoration Foundation, Ltd., the plaintiffs below, appeal the district court's award of summary judgment to defendants United States Army Corps of Engineers (the "Corps"), Secretary of the Army John McHugh, the Commanding General of the Corps, Robert L. Van Antwerp, and Colonel Andrew W. Backus, the District Engineer for the Corps in its Norfolk District. The plaintiffs' Complaint challenged the Corps's decision to approve a permit under section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and section 10 of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403, to build a mooring facility and concrete boat ramp about 3,000 feet from the Back Bay National Wildlife Refuge (the "Refuge") in Virginia Beach, Virginia. As set forth below, we vacate the district court's judgment and remand.

## I.

## A.

Proposed by developer Kenneth Douglas Wilkins, the permitted project (the "Project" or the "Wilkins Project") in a man-made cove off North and Shipps Bays, tributaries to Back Bay, would expand to 76 from 12 the number of existing slips at the same site, the additional 64 being dedicated for watercraft use primarily by residents of nearby condominiums. The approved permit directly authorizes channel dredging, as well as the excavation and relocation within the Project area of silt and other material. *See* 33 U.S.C. § 1344(a) (empowering Secretary of the Army to "issue permits . . . for the discharge of dredged or fill material into the navigable waters [of the United States]"). In addition, the permit provides for the construction of bulkheads, piers, mooring piles, and a walkway in conjunction with the slips and ramp. *See* 33 U.S.C. § 403 (requiring approval of Secretary for, inter alia, "creation of any obstruction not affirmatively authorized by Congress[ ] to the navigable capacity of any of the waters of the United States").

In mitigation of vegetated wetlands cleared to make way for the facility, the permit specifies the creation of equivalent wetlands nearby, and it requires the relocation there of the plants being displaced by the new construction. The permit also attaches a number of operational conditions to the completed Project, including horsepower limitations on boat motors, restrictions on who may use the facility, and the installation of signs informing the public of the establishment of a no-wake zone (the "NWZ") for watercraft within the Refuge. *See* J.A. 232-33.[1]

---

[1]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

Prior to issuing the permit, the Corps solicited public comment on the underlying application; it received over 350 responses, "the overwhelming majority of which were in opposition to the project." J.A. 194. The mayor of Virginia Beach recounted that various state and federal government agencies had "expended countless millions of dollars to conserve Back Bay," and she expressed concern that "detrimental environmental impacts" would result from "greatly increase[d] access for jet skis and powerboats" to the ecologically sensitive area. J.A. 152-53.

In considerably more detail, the Gloucester, Virginia, field office of the United States Fish and Wildlife Service (the "FWS") documented the historical efforts to preserve and restore submerged aquatic vegetation ("SAV") in the area. The FWS surmised that "well documented" adverse effects of motorized watercraft, such as "sediment resuspension, water pollution, shoreline erosion, destruction of SAV and other wetlands, and disturbance to fish and wildlife," would increase if the Wilkins Project were fully realized, and predicted that "because Back Bay is a shallow water system, these effects are likely to be amplified." *Id.* at 159.[2] The Regional Director of the FWS followed up with a separate comment, in which he maintained that the § 404 discharges occasioned by the Project "will have a substantial and unacceptable impact on aquatic resources of national importance," and that, consequently, "the subject permit must be modified, conditioned, or denied." *Id.* at 166.

---

[2]The FWS pointed out that a nearby Corps district headquartered in Wilmington, North Carolina, "is working with many other State and Federal partners in a joint effort to improve the aquatic and wetlands environments" in Back Bay and adjacent Currituck Sound (straddling Virginia and North Carolina), opining that "issuance of a permit for this type of facility . . . will open the door for additional development that is not compatible with the watershed restoration goals developed by many agencies and partners for the Back Bay estuary." J.A. 158, 160.

Similar sentiments were echoed by the Virginia Department of Game and Inland Fisheries (warning that "restoration efforts will face even more challenges in this unique system and may ultimately be rendered unsuccessful"), J.A. 168, and the federal Environmental Protection Agency (professing its belief that "the proposed project is contradictory to the environmental goals of several federal, state, [and] local resource agencies and the public interests," and thus "strongly recommends that the Corps deny the applicant's request for permits"), *id.* at 165. The FWS likewise supported "denial of this project as proposed," *id.* at 161, but suggested that if the Corps were inclined to proceed, it should prepare an Environmental Impact Statement ("EIS") to address "impacts to Federal trust resources . . . due to project construction and operation, habitat loss, and disruption/elimination of migratory pathways and feeding and resting areas." *Id.* at 160-61.

An EIS is "a detailed statement" that ascertains, among other things, the effect of the proposed action on the environment, including "any adverse environmental effects which cannot be avoided should the proposal be implemented," and evaluates alternatives. 42 U.S.C. § 4332(2)(C). As an integral underpinning of the National Environmental Protection Act ("NEPA"), an EIS must be devised in connection with "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." *Id.*; *see State ex rel. Campbell v. O'Leary*, 64 F.3d 892, 896 (4th Cir. 1995). To determine whether a particular action meets the threshold of "significantly affecting" environmental quality, federal agencies are required to draft an Environmental Assessment ("EA"), which is "a concise public document" designed to "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact ['FONSI']." 40 C.F.R. § 1508.9(a)(1); *see Campbell*, 64 F.3d at 896.

In its March 1, 2005 Public Notice of the permit application, the Corps announced its preliminary determination "that

. . . no [EIS] will be required." J.A. 150. In light of the FWS comments advocating for denial or, at a minimum, urging preparation of an EIS, the Corps broached the concept of the NWZ, which it could create through designating the Project vicinity a Temporary Restricted Area.[3] An internal memorandum dated June 16, 2006, reflected the Corps's understanding that the FWS "indicated that implementation of the [NWZ] regulation should alleviate many of their concerns and that they will likely withdraw their objection to the Wilkins [Project] once this plan is in effect." *Id.* at 195.

The NWZ went into effect that same day by virtue of a Local Order, for which Public Notice was subsequently provided on June 28, 2006. Therein, the Corps recognized that watercraft use in and around the Refuge was "adversely impacting [SAV] and nesting, feeding and breeding birds as well as causing shoreline erosion from boat wakes." *Id.* at 197. According to the Corps, the NWZ would secure "a significant measure of protection to the Refuge and its resources." *Id.* The Local Order expired on December 31, 2007, after which the Corps made permanent the Restricted Area designation, effective May 16, 2008. The official Corps Memoranda issued in connection with the temporary and permanent designations each provided that the NWZ

may be enforced by any Federal Agency, State,

---

[3]The Corps's regulations explain that a "restricted area" is "[a] defined water area for the purpose of prohibiting or limiting public access to the area. Restricted areas generally provide security for Government property and/or protection to the public from the risks of damage or injury arising from the Government's use of that area." 33 C.F.R. § 334.2(b). A "no-wake zone" is not specifically defined, but within the context of the permanent Restricted Area designation, detailed *infra*, the NWZ in this case means that, save for certain carefully delineated exceptions, "[n]o vessel of any type shall operate at a speed that causes a wake while they are within 100 yards of the shoreline of the Back Bay National Wildlife Refuge." J.A. 211. The shoreline is deemed to commence at the "Ordinary High Water" mark. *Id.*

Local or County Law Enforcement agency, or Private Security Firms in the employment of the [Corps] or U.S. Fish and Wildlife Service so long as the entity undertaking enforcement action has the legal authority to do so under the appropriate Federal, State, or Local laws.

*Id.* at 192, 212.

As a practical matter, however, enforcement of the NWZ appears to be problematic. In the course of interagency discussions of the Project in 2006, it was revealed that the marine detachment of the Virginia Beach Police Department was "unable to routinely patrol the Back Bay due to current staffing constraints." J.A. 186. Responding to the continuing concerns expressed by the FWS, Colonel Dionysios Anninos, the District Commander for the Corps, conceded on September 11, 2008, that "[e]nforcement will be an issue," but he was "hopeful" that compliance with the NWZ would be achieved "through education, signage, [and] public pressure." *Id.* at 203, 223. Colonel Anninos insisted, however, that "the lack of funding necessary for a state or federal agency to fulfill obligations is not a sufficient reason to deny a project." *Id.*

By letter of October 3, 2008, the FWS Regional Office memorialized the agency's ongoing discussions with the Corps concerning the Wilkins Project. Although the FWS acknowledged that "details of the measures are still to be worked out," its acquiescence in the Project was conditioned on "[a]dequate funding for the enforcement of" the NWZ, with further discussions to be conducted as to the proper allocation of "[r]esponsibility of enforcement and cost share funds." J.A. 226-27. On October 10, 2008, Colonel Anninos wrote to his district's regulatory section, explaining that the Corps's coordination with the FWS had addressed the latter agency's concerns. *See id.* at 229. That same date, the Corps issued the permit.

The permit, however, neither mandates enforcement of the NWZ nor guarantees funding therefor. Aside from requiring that signage be posted, the permit specifies only that Wilkins "serve on and participate in a committee of local, state and federal agencies and community stakeholders to attempt to establish a funding program for enforcement of the [NWZ] in Back Bay." J.A. 233. The permit identifies several potential sources for such funding, including grants, assessments, and user fees, and notes that Wilkins also "may be required to contribute a fair and equitable portion of the funding for this program." *Id.* at 234.

In the final EA, issued contemporaneously with the permit, Colonel Anninos, on behalf of the Corps, reiterated the "consensus . . . that the currently unrestricted use of the waters in and around the Refuge may be having an adverse impact on the sensitive and unique natural resources of the . . . Refuge and Back Bay as a whole." J.A. 259. The Corps observed, however, that refusing the permit "would not solve existing and future problems associated with recreational boating in Back Bay," and insisted that "denying this proposal would logically necessitate the denial of all future private piers, boat ramps and mooring projects in Back Bay due to the potential for cumulative impacts." *Id.* at 269. Notwithstanding that "there are no city or state maritime patrols within the Bay," *id.* at 261, the Corps asserted that the NWZ "will limit and reduce any adverse impacts from the construction and operation of the facility," *id.* at 250. The EA culminated in a FONSI, thus declaring that "no [EIS] will be prepared." *Id.* at 277.

B.

The plaintiffs filed a Complaint in the District Court for the District of Columbia on December 14, 2009, seeking review of the Corps's decision, in accordance with § 404 of the CWA, to allow the dredging and subsequent discharge via relocation of silt and fill material, and challenging the Corps's

determination that issuance of the permit does not qualify under NEPA as a federal action "significantly affecting the quality of the human environment," such that an EIS must be prepared in advance. On the defendants' motion, and over the plaintiffs' opposition, venue was subsequently transferred to the Eastern District of Virginia.

The district court exercised jurisdiction over both aspects of the Complaint pursuant to the general review provisions of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 702, 704; *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (instructing that "[c]laims challenging federal agency action under the CWA and NEPA are subject to judicial review under the APA"). The court directed the filing of the administrative record, after which the parties submitted cross-motions for summary judgment. Following a hearing on January 28, 2011, the district court, by its Opinion and Order of February 9, 2011, entered judgment on behalf of the defendants.

In so doing, the district court rejected the plaintiffs' contention that potential harm to the Refuge from boating activities could properly be considered a legitimate secondary effect of the dredging and filling authorized pursuant to the CWA. *See Friends of Back Bay v. U.S. Army Corps of Eng'rs*, No. 2:10-cv-0070, slip op. at 36 (E.D. Va. Feb. 9, 2011). With respect to the NEPA challenge, the court concluded that the Corps's decision to grant the permit without preparing an EIS was within the agency's broad discretion and not contrary to law. *See id.* at 30. Upon timely notice filed on February 23, 2011, the plaintiffs pursue this appeal.

## II.

The APA provides that a reviewing court is bound to "hold unlawful and set aside agency action" for certain specified reasons, including whenever the challenged act is "arbitrary, capricious, an abuse of discretion, or otherwise not in accor-

dance with law." 5 U.S.C. § 706(2)(A); *see Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). The foregoing statutory criteria render our oversight "highly deferential, with a presumption in favor of finding the agency action valid," yet the arbitrary-and-capricious standard does not "reduce judicial review to a rubber stamp of agency action." *Id.* (citation and internal quotation marks omitted).

To comply with NEPA, "federal agencies must take a 'hard look' at the potential environmental consequences of their actions." *Aracoma Coal*, 556 F.3d at 191 (citation omitted). In a similar fashion, we must "engage in a 'searching and careful' inquiry of the record," so that we may "consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.* at 192 (quoting *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Insofar as an agency's decision may be deemed unreasonable as a matter of law, it is likely to have been arbitrary and capricious. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 n.23 (1989) (noting courts' adoption of "arbitrary and capricious" and "reasonableness" standards under the APA, and explaining that difference between the two "is not of great pragmatic consequence"). We evaluate the reasonableness of the Corps's decisionmaking de novo, without deference to the district court's resolution of the issue. *See Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996).

III.

A.

1.

The parties devoted much effort below, and have again on appeal, debating how to properly characterize the EA. According to the plaintiffs, the Corps found at the threshold that granting the permit would affect the environment to the

degree necessary to trigger the need for an EIS, but that establishment of the NWZ would ameliorate the adverse effects such that the net result would be no significant impact. When an agency relies on such a "mitigated FONSI," it may avoid preparing an EIS. *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191-92 (4th Cir. 2009). In support of their position, the plaintiffs point out that the permit application caused the Corps to examine and appreciate the problems associated with watercraft use in Back Bay; the Project thus spurred the Corps's decision to designate the Refuge as a Restricted Area and impose the NWZ.

The defendants, to the contrary, maintain that because the NWZ was in effect for nearly two years prior to issuance of the EA, it constituted a "baseline" condition reflecting the state of the environment absent any undertaking pursuant to the permit. *See N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, No. 11-2210, 2012 WL 1548685 (4th Cir. May 3, 2012), at *6 (equating baseline with "no action" EIS alternative mandated for consideration by 40 C.F.R. § 1502.14(d)). As such, the argument goes, the Corps considered from a historical perspective (albeit a somewhat brief one) the issues giving rise to its creation of the Restricted Area and the efficacy of the NWZ in resolving those issues, but nonetheless concluded that a FONSI was appropriate.

The parties perceive the mitigation/baseline distinction important in light of pertinent authorities requiring that assumptions underlying a mitigated FONSI be supported by record evidence. *See, e.g.*, *Hill v. Boy*, 144 F.3d 1446, 1450-51 (11th Cir. 1998) (ruling Corps's refusal to prepare EIS arbitrary and capricious where no evidence supported key mitigation assumption and no analysis conducted gauging effect of opposite assumption); *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d. Cir. 1997) (concluding that Forest Service arbitrarily and capriciously bypassed EIS where record failed to establish likely efficacy of mitigation proposal). An unjustified leap of logic or unwarranted assump-

tion, however, can erode any pillar underpinning an agency action, whether constructed from the what-is or the what-may-be. Once the roof caves in, it offers but a smattering of solace to explain that only the latter were inspected and deemed sound.

A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision. We recently confronted precisely that situation in *North Carolina Wildlife Federation*, *supra*. There, the federal and state agencies charged with evaluating the construction of a proposed toll highway erroneously adopted the assumption that the road would be built in estimating the consequences resulting from no action being taken. In light of the obvious and fundamental blunder, we had no difficulty remanding the matter for reconsideration, noting that "courts not infrequently find NEPA violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project." *N.C. Wildlife Fed'n*, 2012 WL 1548685, at *6 (citations and footnote omitted).

Here, it cannot be disputed that the creation and continued existence of the NWZ is a foundational proposition upon which the FONSI was premised. The EA did not pretend to the contrary; the Corps, to its credit, did not endeavor therein to downplay the potential deleterious consequences if watercraft are suffered to freely scurry about the Refuge.[4] The

[4]The EA asserts that educating the public about the NWZ, as an integral part of the operational conditions incorporated within the permit and made an enforceable condition thereof, "will ensure that boaters from the Wilkins . . . Facility will not adversely impact the ecologically sensitive Back Bay/North Bay area," and "will limit and reduce any adverse impacts from the construction and operation of the facility." J.A. 250. In summing up the EA, Colonel Anninos expressed the Corps's conclusion that the permit conditions were of sufficient heft such that "there are no longer substantial adverse impacts" associated with the Project. J.A. 277. The defendants contend that "adverse impacts" and even "substantial adverse impacts" do

NWZ, however, is entirely unenforced. Indeed, as revealed at the hearing below on January 28, 2011, the NWZ remained unmarked and undisclosed to the public nearly five years after its initial implementation. *See* J.A. 63, 73-74. As the district court astutely remarked at the hearing, "[E]ven if people wanted to obey the no wake zone, I don't know how in the world they could do it without it being marked." J.A. 78.

The most that the Corps could say was that it was "hopeful" that the public would comply with the secret NWZ. J.A. 203, 223. No doubt the thoughtful folks who leave cauldrons of candy on their front porches at Halloween hope the neighborhood trick-or-treaters will behave themselves and take only their fair share, but common experience has shown that those hopes often remain unfulfilled. While the betrayal of trust on All Hallows' Eve might cost the credulous a bag or two of sweets, the potential cost to the Refuge in this case from the Corps's hopefulness is, inarguably, considerably higher.

Measures designed to render minimal a particular action's impact upon the environment, whether proposed in mitigation or assumed to already exist, are more readily deemed efficacious (and thus more comfortably within an agency's broad prerogative to propose or assume) "when they are likely to be policed," *Hoffman*, 132 F.3d at 17 (citing *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234, 239 n.9 (D. Vt.

---

not necessarily rise to the level of "significant impacts" triggering an EIS, but any notion that unrestricted watercraft access to the Refuge would be of no significance under NEPA is belied both by the lack of that sort of analysis in the EA and by the sustained efforts of the Corps in pursuing and implementing the temporary Local Order and subsequent Restricted Area designation. The Corps undertook both courses of conduct notwithstanding its estimate that the 64 additional slips associated with the Wilkins Project would increase traffic no more than three to six percent, *see* J.A. 257, and despite a three-day stakeout of about ten percent of the Refuge it conducted in August 2006, at the conclusion of which the Corps surmised that there is "minimal traffic on the bay during the majority of the boating season." J.A. 260.

1992)). Such policing may occur prospectively by administrative enforcement through the imposition of a mandatory permit condition, as in *Abenaki Nation*, or it may be recognized as a baseline incident, enforced by a literal police presence. Neither is currently the case in Back Bay.

Absent any reasonable basis to conclude that, as of October 2008, the NWZ was being adequately enforced or its efficacy was otherwise assured, the concept thereof as discussed within the EA was a logical nullity. Being unable to divorce the Corps's demonstrably incorrect assumption of an effective NWZ from its ultimate conclusion that no EIS need be prepared, we find ourselves constrained to invalidate the resultant FONSI as arbitrary and capricious. The judgment below to the contrary must therefore be vacated, and the matter remanded to the district court for further remand to the Corps.

2.

The question remains as to what action the Corps may take on remand. The Council on Environmental Quality has promulgated a regulation intended to guide federal agencies in ascertaining the likelihood that their actions will, within the meaning of NEPA, significantly affect the environment. *See* 40 C.F.R. § 1508.27. Decisionmakers are required to consider both context and intensity, with the latter criterion "refer[ring] to the severity of impact." *Id.* at § 1508.27(b).

The regulation details ten intensity factors to be considered, of which the plaintiffs direct our attention to five they believe support the conclusion that an EIS must be prepared. Without discounting the potential applicability of any of the ten factors, two in particular militate strongly in favor of the plaintiffs' position. Those are the "[u]nique characteristics of the geographic area such as . . . wetlands . . . or ecologically critical areas," *id.* at § 1508.27(b)(3), and "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," *id.* at § 1508.27(b)(4).

The EA acknowledged that Back Bay is part of the Albemarle-Pamlico Estuarine Sound System, which has been "designated by EPA as an estuary of national significance." J.A. 248. The bay has been described "as one of the most diverse and extensive ecosystems in southeastern Virginia," and though its marsh communities are characteristic of the area and that of northeastern North Carolina, "they are considered globally rare." J.A. 249. It thus appears beyond question that the Refuge and its vicinity qualify as unique and ecologically critical.

Moreover, the debate concerning the potential effects of the Wilkins Project on the quality of the human environment in and around Back Bay has proved to be highly controversial. We say this not in the sense that all contested actions affecting the environment generate a degree of controversy, particularly among those whose sensitivities may be peculiarly attuned to such matters, but in the sense that no fewer than four respected governmental entities (including two of the Corps's sister agencies of the federal government) unanimously opposed the permit application as proposed. *See Davis v. Mineta*, 302 F.3d 1104, 1123 (10th Cir. 2002) (recognizing that courts "may properly be skeptical" of the factual basis of agency conclusions "if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise" (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983))).

The FWS specifically recommended preparation of an EIS as an alternative to denying the permit, and we agree that is the preferred approach here. Even were the situation considerably less clear-cut, we remain mindful that "when it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared." *Hoffman*, 132 F.3d at 18. We concur with the view of the Second Circuit in *Hoffman* that the policy goals underlying NEPA are best served if agencies "err in favor of preparation of an EIS

when . . . there is a substantial possibility that the [proposed] action may have a significant impact on the environment." *Id.*

### B.

The plaintiffs also reassert on appeal their contention that, for several reasons, the permit should not have issued pursuant to § 404 of the CWA. Among other things, the plaintiffs maintain that, apart from the discrete movement of silt necessary to construct the mooring facility and boat ramp, the increase in watercraft traffic resulting from completion of the Wilkins Project may properly be considered as a secondary effect on the aquatic ecosystem "associated with a discharge of dredged or fill materials," though the presence of the additional boats and jet skis "do not result from the actual placement of the dredged or fill material." 40 C.F.R. § 230.11(h)(1); *see Fox Bay Partners v. U.S. Army Corps of Eng'rs*, 831 F. Supp. 605 (N.D. Ill. 1993).

The district court rejected the plaintiffs' § 404 challenge, but we need not address it here. Having already concluded that the Corps's grant of the permit violated the applicable NEPA procedural requirements, we are not inclined to decide whether it should not have issued on different grounds. Depending on the result of the EIS and the implementation thereof undertaken by the Corps on remand, the plaintiffs' CWA objections may not again present themselves. In the event the issue recurs, however, it can be revisited by the Corps and, if necessary, the district court, in the normal course of events.

### IV.

Pursuant to the foregoing, we vacate the judgment below and remand for the district court to remand to the Corps for preparation of an EIS, and for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*