**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1521

CASA DE MARYLAND; COALITION FOR HUMANE IMMIGRANT RIGHTS (CHIRLA); FAIR IMMIGRATION MOVEMENT (FIRM); ONE AMERICA; PROMISE ARIZONA; MAKE THE ROAD PENNSYLVANIA; MICHIGAN UNITED; ARKANSAS UNITED COMMUNITY COALITION; JUNTA FOR PROGRESSIVE ACTION, INC.; ANGEL AGUILUZ; ESTEFANY RODRIGUEZ; HEYMI ELVIR MALDONADO; NATHALY URIBE ROBLEDO; ELISEO MAGES; JESUS EUSEBIO PEREZ; JOSUE AGUILUZ; MISSAEL GARCIA; JOSE AGUILUZ; MARICRUZ ABARCA; ANNABELLE MARTINES HERRA; MARIA JOSELINE CUELLAR BALDELOMAR; BRENDA MORENO MARTINEZ; LUIS AGUILAR; J.M.O., a minor child; ADRIANA GONZALES MAGOS, next of friend to J.M.O.; A.M., a minor child; ISABEL CRISTINA AGUILAR ARCE, next of friend to A.M.,

Plaintiffs - Appellants,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; DONALD J. TRUMP, in his official capacity as President of the United States; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; L. FRANCIS CISSNA, in his official capacity as Director of U.S. Citizenship and Immigration Services; RONALD D. VITIELLO, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; KEVIN K. MCALEENAN, in his official capacity in his official capacity as Acting Commissioner of Custom and Border Protection; UNITED STATES OF AMERICA,

Defendants - Appellees.

CASA DE MARYLAND; COALITION FOR HUMANE IMMIGRANT RIGHTS (CHIRLA); FAIR IMMIGRATION MOVEMENT (FIRM); ONE AMERICA; PROMISE ARIZONA; MAKE THE ROAD PENNSYLVANIA; MICHIGAN UNITED; ARKANSAS UNITED COMMUNITY COALITION; JUNTA FOR PROGRESSIVE ACTION, INC.; ANGEL AGUILUZ; ESTEFANY RODRIGUEZ; HEYMI ELVIR MALDONADO; NATHALY URIBE ROBLEDO; ELISEO MAGES; JESUS EUSEBIO PEREZ; JOSUE AGUILUZ; MISSAEL GARCIA; JOSE AGUILUZ; MARICRUZ ABARCA; ANNABELLE MARTINES HERRA; MARIA JOSELINE CUELLAR BALDELOMAR; BRENDA MORENO MARTINEZ; LUIS AGUILAR; J.M.O., a minor child; ADRIANA GONZALES MAGOS, next of friend to J.M.O.; A.M., a minor child; ISABEL CRISTINA AGUILAR ARCE, next of friend to A.M.,

Plaintiffs - Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; DONALD J. TRUMP, in his official capacity as President of the United States; WILLIAM P. BARR, in his official capacity as Attorney General of the United States; ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; L. FRANCIS CISSNA, in his official capacity as Director of U.S. Citizenship and Immigration Services; RONALD D. VITIELLO, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; KEVIN K. MCALEENAN, in his official capacity in his official capacity as Acting Commissioner of Custom and Border Protection; UNITED STATES OF AMERICA,

Defendants - Appellants.

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge.  (8:17-cv-02942-RWT)

Argued:  December 11, 2018                              Decided:  May 17, 2019

Before KING, DIAZ, and RICHARDSON, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, dismissed in part, and remanded by published opinion. Judge Diaz wrote the majority opinion, in which Judge King joined. Judge Richardson wrote an opinion concurring in part and dissenting in part.

**ARGUED:** John A. Freedman, Emily Newhouse Dillingham, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellants/Cross-Appellees. Hashim M. Mooppan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** Elizabeth J. Bower, Kevin B. Clark, Priya R. Aiyar, WILLKIE FARR & GALLAGHER LLP, Washington, D.C.; Dennis A. Corkery, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C.; Ajmel A. Quereshi, HOWARD UNIVERSITY SCHOOL OF LAW, Washington, D.C., for Appellants/Cross-Appellees. Chad A. Readler, Acting Assistant Attorney General, Mark B. Stern, Abby C. Wright, Thomas Pulham, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees/Cross-Appellants.

DIAZ, Circuit Judge:

In 2012, the Secretary of Homeland Security established the Deferred Action for Childhood Arrivals ("DACA") policy. Under this policy, certain noncitizens who came to the United States as children could receive deferred action—a decision forbearing their removal from the country. Hundreds of thousands of individuals, including those who appear as Plaintiffs in these appeals, applied for and received grants of deferred action under DACA.

In 2017, the Acting Secretary of Homeland Security rescinded DACA, which prompted a flurry of lawsuits across the country challenging the action. Plaintiffs in these appeals (a group of individuals and organizations) allege that the government's decision to rescind DACA (and its changes to policies governing the use of information provided by DACA applicants) violates the Fifth Amendment to the U.S. Constitution, as well as the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, and common law principles of estoppel.

On the government's motion for summary judgment, the district court determined that Plaintiffs' challenges were subject to judicial review, that the rescission of DACA and changes to the government's policies on use of DACA applicant information did not violate the APA, that the constitutional claims were without merit, and that DACA's rescission did not violate principles of estoppel. The court, however, ordered the government (on grounds of estoppel) to comply with the policies promulgated in 2012 on the use of information provided by DACA applicants and enjoined it from altering these policies.

4

As we explain, we agree with the district court that Plaintiffs' challenges are subject to judicial review. We also agree with the district court that the government's decision to rescind DACA did not require notice and comment under the APA. But the decision nonetheless violated the APA because—on the administrative record before us—it was not adequately explained and thus was arbitrary and capricious. We also conclude that the district court erred in ordering the government to comply with its policies promulgated in 2012 on the use of information provided by DACA applicants and enjoining it from altering those policies.

Given our resolution, we decline, under the doctrine of constitutional avoidance, to decide whether Plaintiffs' Fifth Amendment rights were violated. Nor do we address Plaintiffs' remaining arguments challenging the district court's grant of summary judgment.

I.

A.

Before turning to the record material, some context is in order. The Secretary of Homeland Security is "charged with the administration and enforcement" of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1103(a)(1). One of the enforcement tools available under the INA is the removal of aliens from the United States. "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United*

*States*, 567 U.S. 387, 396 (2012); *see* 8 U.S.C. §§ 1182(a), 1227(a) (listing classes of deportable and inadmissible aliens).

Because of the "practical fact," however, that the government can't possibly remove all such aliens, the Secretary has discretion to prioritize the removal of some and to deprioritize the removal of others. *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015); *see* 6 U.S.C. § 202(5) (charging the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities"). One form of discretion the government exercises is deferred action, which "is a decision by Executive Branch officials not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country." *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 487 (9th Cir. 2018), *petition for cert. filed*, 87 U.S.L.W. 3201 (U.S. Nov. 5 & 19, 2018) (No. 18-587).

Immigration authorities have granted deferred action and related forms of relief from deportation or removal since at least the early 1960s. *See id.* at 487-89; The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ____, 2014 WL 10788677, at *10-13 (Nov. 19, 2014) ("2014 OLC Opinion")[1]

---

[1] The Office of Legal Counsel, or OLC, is an office within the U.S. Department of Justice that drafts legal opinions of the Attorney General and provides its own written opinions and other advice in response to requests from various agencies within the executive branch. *See* 28 U.S.C. § 512 (providing that agency heads may seek legal advice from the Attorney General); 28 C.F.R. § 0.25 (delegating Attorney General's authority to render legal advice to OLC); "Office of Legal Counsel," The United States Department of Justice, https://www.justice.gov/olc (saved as ECF opinion attachment). (Continued)

6

(addressing the Department's practices of granting deferred action ad hoc and through broad policies making relief from removal available to particular groups of aliens). The Supreme Court also has recognized deferred action by name, describing it as the executive branch's "regular practice . . . of exercising . . . discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 484 (1999).

## B.

Turning now to the record material, the essential undisputed facts are as follows. To ensure government resources were not spent on the "low priority cases" of "certain young people who were brought to [the United States] as children and know only this country as home," J.A. 129, then Secretary of Homeland Security Janet Napolitano announced in a June 15, 2012, memorandum the policy that has become known as DACA. The DACA Memo made renewable two-year terms of deferred action from removal and authorization for employment available to individuals who came to the United States as children, satisfied certain other eligibility criteria,[2] and passed background checks.

---

Although not binding on courts, OLC opinions "reflect[] the legal position of the executive branch" and "are generally viewed as providing binding interpretive guidance for executive agencies." *United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011) (internal quotation marks omitted) (Bea, J., concurring in part and dissenting in part), *aff'd in part, rev'd in part*, 567 U.S. 387 (2012).

[2] In its original form, deferred action was available to individuals who were under age 16 when they came to the United States, were not above age 30, had continuously (Continued)

To be considered for deferred action under DACA, applicants had to submit to biometric screening and provide extensive personal information to the Department of Homeland Security. The Department informed applicants that the information provided was "protected from disclosure . . . for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings.[3] J.A. 1004. The Department warned, however, that these policies could be "modified, superseded, or rescinded at any time without notice" and were "not intended to" and did not "create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.*

The DACA Memo made clear that it "confer[red] no substantive right, immigration status[,] or pathway to citizenship." J.A. 131. DACA recipients, however, were eligible to receive a host of other benefits under preexisting statutes and regulations, including advance parole allowing reentry into the United States after travel abroad, social security benefits, and certain forms of public assistance. *See* 8 U.S.C. §§ 1182(d)(5)(A), 1611(b)(1), 1621(b)(1), (d); 8 C.F.R. §§ 1.3(a)(4)(vi), 212.5. DACA

---

resided in the United States for at least five years preceding June 15, 2012, and were present in the country on June 15, 2012, and satisfied certain other requirements relative to public safety and education or military service.

[3] Separately, the Department noted that the information provided could be shared with national security and law enforcement agencies "for purposes other than removal." J.A. 1004.

recipients also were eligible to receive employment authorization on a showing of economic necessity. *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

In November 2014, then Secretary of Homeland Security Jeh Johnson announced a separate deferred action policy for certain parents of United States citizens and lawful permanent residents that became known as Deferred Action for Parents of Americans ("DAPA").[4] The DAPA memorandum also expanded DACA by (1) extending the deferred action and employment authorization terms from two to three years; (2) removing the "age cap" that previously excluded certain individuals from DACA eligibility; and (3) reducing the period of time that someone needed to be physically present in the United States to be eligible for DACA. *See* J.A. 167-68.

A coalition of states led by Texas sued to block implementation of the DAPA policy (and its proposed expansions to DACA) on the grounds that it violated the APA and the Take Care Clause of the Constitution, U.S. Const. art. II, § 3 (the "*Texas litigation*"). *See Texas v. United States*, 86 F. Supp. 3d 591, 604 & n.1, 607 (S.D. Tex. 2015). The district court in that case granted injunctive relief, *id.* at 671-72, 677-78 & n.111, and the Fifth Circuit affirmed, *Texas v. United States*, 809 F.3d 134, 178-79, 186,

---

[4] The 2014 OLC Opinion concluded that DAPA "would constitute a permissible exercise of [the Department of Homeland Security]'s enforcement discretion under the INA." J.A. 162; 2014 WL 10788677, at *23. While the opinion doesn't directly address the Department's authority to implement DACA, it does recount that, before DACA was announced, the OLC had "orally advised" the Department that the policy would be permissible "provided that immigration officials retained discretion to evaluate each application on an individualized basis." J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.

9

188 (5th Cir. 2015). The Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

In June 2017 (approximately five months after the Trump administration took office), then Secretary of Homeland Security John Kelly rescinded DAPA but left in place DACA and the deferred action relief and employment authorizations granted between the issuance of the DAPA Memo and the district court's decision in the *Texas* litigation.

On September 4, 2017, Attorney General Jefferson Sessions wrote to then Acting Secretary Elaine Duke, advising her to rescind DACA. According to the Attorney General:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related . . . DAPA . . . policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. . . . Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.[5]

> In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

---

[5] Plaintiffs in the *Texas* litigation had written to General Sessions in June 2017, requesting that the Secretary of Homeland Security rescind DACA and prohibit new grants and renewals of deferred action. The letter warned that, if the Executive Branch failed to so act, plaintiffs there would amend their complaint to challenge DACA.

J.A. 379 (internal citations omitted).

The next day, Acting Secretary Duke rescinded DACA and instructed Department personnel to "wind-down" the policy. J.A. 380, 383. The Secretary's Rescission Memo recounts in a "Background" section the DACA and DAPA policies, the *Texas* litigation, Secretary Kelly's rescission of DAPA, the letter to Attorney General Sessions from the plaintiffs in the *Texas* litigation, and General Sessions's September 4 letter. The Rescission Memo then states:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017[,] letter from the Attorney General, it is clear that the June 15, 2012[,] DACA program should be terminated.

J.A. 383.

The Rescission Memo—which issued without notice or an opportunity for public comment—did not end DACA outright. Rather, it allowed for a case-by-case basis adjudication of initial applications for deferred action and employment authorization accepted by September 5, 2017, and renewal requests accepted by October 5, 2017, from current DACA beneficiaries whose benefits would expire between September 5, 2017, and March 5, 2018.

The Memo stated that the Department would not terminate existing grants of deferred action and employment authorization under DACA "solely based on the directives" in the Memo and would "generally honor" approved applications for advanced parole. *Id.* But it made clear that the Department would reject all other DACA applications, including initial applications filed after September 5, 2017, and all pending

11

and future applications for advance parole under DACA. *Id.* The Memo, however, explicitly placed "no limitations" on the Department's "otherwise lawful enforcement . . . prerogatives." J.A. 384.

The Department also announced that once an individual's deferred action under DACA expired, information provided by applicants would not be "proactively provided to [law enforcement agencies] for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1142. For individuals whose pending DACA requests were denied, the announcement stated that "[g]enerally, information provided in DACA requests will not be proactively provided to other law enforcement entities . . . for the purpose of immigration enforcement proceedings" unless the requestor posed "a risk to national security or public safety" or met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1143.

Nearly 800,000 individuals have received deferred action under DACA since its inception.

C.

Plaintiffs' complaint raises a host of challenges to the government's decision to rescind DACA. First, the complaint alleges that the rescission is a substantive rule and thus requires notice-and-comment rulemaking under the APA. Next, it asserts that the government's decisions to rescind DACA and change the way the government proposed

12

to share personal information collected from DACA applicants were arbitrary, capricious, and contrary to law, in violation of the APA, and violated the substantive and procedural due process protections of the Fifth Amendment. Plaintiffs also allege that the decision to rescind DACA violates the equal protection guarantee of the Fifth Amendment. Finally, Plaintiffs say that the government should be equitably estopped from rescinding DACA or using information provided by DACA applicants for immigration enforcement purposes beyond those first announced in 2012, when the government's information-sharing policies were first implemented.

The district court granted partial summary judgment to the government. The court found (contrary to the government's contention) that Plaintiffs' claims were justiciable. *Casa De Maryland v. DHS*, 284 F. Supp. 3d 758, 768-71 (D. Md. 2018). But on the merits, the court determined that DACA's rescission and the government's changes to its policies on information-sharing did not violate the APA and that Plaintiffs' constitutional claims lacked merit. *Id.* at 771-77. The court also determined that DACA's rescission did not violate the doctrine of estoppel. *Id.* at 777-78.

The court, however, granted summary judgment to Plaintiffs on the portion of their estoppel claim pertaining to the sharing of DACA applicant information. The court ordered the government to comply with the policies as originally announced in 2012 and enjoined it from altering these policies. *Id.* at 778-79; J.A. 1531-33.

These appeals followed. We review a district court's grant of summary judgment de novo. *Roland v. USCIS*, 850 F.3d 625, 628 (4th Cir. 2017). "We can affirm a grant of summary judgment only where there is no genuine dispute as to any material fact and the

13

movant is entitled to judgment as a matter of law." *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 889-90 (4th Cir. 2015) (internal quotation marks omitted). We review a district court's grant of an injunction for abuse of discretion. *South Carolina v. United States*, 907 F.3d 742, 753 (4th Cir. 2018).

## II.

We begin with the government's argument that Plaintiffs' claims are not justiciable, an issue we consider de novo. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014); *Angelex Ltd. v. United States*, 723 F.3d 500, 505 (4th Cir. 2013).

### A.

The government contends that Plaintiffs' claims are immune from judicial review under 8 U.S.C. § 1252(g), a provision of the INA stating, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

According to the government, § 1252(g) bars review here in two ways. First, noting that the Supreme Court in *AAADC* observed that § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations," 525 U.S. at 485,[6] the government contends that this

---

[6] The Supreme Court said as much after reviewing a treatise describing the practice of deferred action and litigation that would result when it was not granted. *AAADC*, 525 U.S. at 484-85. That treatise, however, referred explicitly to "[e]fforts to (Continued)

14

section bars review because DACA's rescission is a "no deferred action" decision. But this contention ignores both the plain language of § 1252(g) and the Supreme Court's determination in *AAADC* that this section "applies *only* to three discrete actions that the [Secretary of Homeland Security] may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (first emphasis added). In rescinding DACA, the Acting Secretary did none of these things.

Second, the government says that § 1252(g) precludes review because DACA's rescission is an initial "action" in the commencement of removal proceedings. As the government would have it, review of its decision to rescind DACA must await a final order of removal. The Supreme Court in *AAADC* though "specifically rejected a broad reading of the three discrete actions listed in [§] 1252(g)." *Regents*, 908 F.3d at 504. Specifically, "decisions to open an investigation, [or] to surveil the suspected violator" are not encompassed by § 1252(g)'s jurisdictional bar, even though these decisions "may be part of the deportation process." *AAADC*, 525 U.S. at 482; *see Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (Alito, J., plurality) ("[In *AAADC*, w]e did not interpret [§ 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions. . . . Instead, we read the language to refer *to just those three specific actions themselves*." (emphasis added)).

---

challenge the refusal to exercise [deferred action] *on behalf of specific aliens*." *Id.* at 485 (emphasis added). Plaintiffs don't challenge the refusal to grant deferred action to a particular individual.

And while we accept that § 1252(g) "is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings," *AAADC*, 525 U.S. at 487, the government hasn't moved to remove any of the Plaintiffs. The two Circuit decisions on which the government relies to support the proposition that judicial review of DACA's rescission is available only through review of a final order of removal—*Vasquez v. Aviles*, 639 F. App'x 898 (3d Cir. 2016), and *Botezatu v. INS*, 195 F.3d 311 (7th Cir. 1999)—are inapposite. Those cases involved challenges to individual "no deferred action" decisions by aliens adjudicated removable. *Vasquez*, 639 F. App'x at 901; *Botezatu*, 195 F.3d at 314. The government's reliance on *AAADC* is therefore misplaced, and we reject its argument that § 1252(g) bars review of Plaintiffs' claims.[7]

B.

The government argues that another provision of the INA—8 U.S.C. § 1252(b)(9)—bars review of Plaintiffs' claims. The government did not press this argument in the district court. But because a party may challenge subject matter jurisdiction for the first time on appeal, *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003), we consider this issue.

---

[7] *Accord Regents*, 908 F.3d at 504 (holding § 1252(g) doesn't deprive courts of jurisdiction to review DACA's rescission); *NAACP v. Trump*, 298 F. Supp. 3d 209, 224 (D. D.C. 2018) (rejecting as "misplaced" government's reliance on *AAADC* and finding § 1252(g) didn't bar review of challenges to DACA's rescission), *appeals docketed*, Nos. 18-5243, 18-5245 (D.C. Cir. Aug. 10 & 13, 2018), *petition for cert. before judgment filed*, 87 U.S.L.W. 3204 (U.S. Nov. 5, 2018) (No. 18-588); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 152-54 (E.D.N.Y. 2017) (rejecting government's § 1252(g) argument in challenge to DACA's rescission), *appeals docketed*, Nos. 18-1985, 18-1986 (2d Cir. July 5, 2018), *petition for cert. before judgment filed*, 87 U.S.L.W. 3201 (U.S. Nov. 5, 2018) (No. 18-589).

16

Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."  8 U.S.C. § 1252(b)(9).  But that provision doesn't help the government here because it "applies *only* with respect to review of an *order of removal* under [8 U.S.C. § 1252(a)(1)]."  *INS v. St. Cyr*, 533 U.S. 289, 313 (2001) (emphases added; internal quotation marks and alteration omitted); *see Calcano-Martinez v. INS*, 232 F.3d 328, 340 (2d Cir. 2000) ("Congress enacted [§ 1252(b)(9)] for the important purpose of consolidating all claims that *may be brought in removal proceedings* into one final petition for review of a final order in the court of appeals." (emphasis added)), *aff'd*, 533 U.S. 348 (2001).

The government's contention that § 1252(b)(9) bars review thus is without merit.

C.

Next, the government contends that judicial review is foreclosed under the APA because the decision to rescind DACA is committed to agency discretion by law.  We do not agree.

"Although there is a 'strong presumption' in favor of judicial review of agency action," *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)), the APA bars judicial review of agency action "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  The government says that the Acting Secretary's decision to rescind DACA is a type of agency enforcement decision that is

17

presumptively unreviewable under the Supreme Court's decision in *Heckler v. Chaney*, 470 U.S. 821 (1985).[8] Invoking the "broad discretion exercised by immigration officials" that is a "principal feature of the removal system," *Arizona*, 567 U.S. at 396, the government urges that the concerns driving *Chaney*'s presumption of unreviewability apply with "particular force" in the removal context, a context in which allowing delay would result in ordering the government to allow a "continuing violation" of federal law, *AAADC*, 525 U.S. at 490.

And while conceding that an agency's expression of a legal interpretation announced in a broad or general enforcement policy may be reviewable, the government says that the decision to rescind DACA is distinguishable because it rested on discretionary enforcement concerns and expressed the Department of Homeland Security's view about the scope of its enforcement authority, not the substantive unlawfulness of the policy. Finally, relying on the Supreme Court's post-*Chaney* decision in *ICC v. Bhd. of Locomotive Eng'rs* ("*BLE*"), 482 U.S. 270 (1987), the government argues that, even if the sole rationale for the rescission decision was the view that DACA was unlawful, such rationale cannot provide a "hook" to support review of the decision.

---

[8] The government doesn't appear to seriously contest that Plaintiffs' procedural APA claim challenging the decision to rescind DACA is subject to judicial review. *Accord Lincoln v. Vigil*, 508 U.S. 182, 195-98 (1993) (process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements, regardless of reviewability of the substance of the rule).

Because the government relies so heavily on *Chaney* for its argument, we turn to that decision. There, a group of death row inmates petitioned the Food and Drug Administration to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. 470 U.S. at 823-24. The agency refused to act, based on its view that its jurisdiction to act under the substantive law was unclear and, even if it had jurisdiction, it would decline to exercise that jurisdiction under its inherent discretion to do so. *Id.* at 824-25. The petitioners filed suit, seeking an order directing the agency to act. *Id.* at 825.

Without addressing the jurisdictional issue, the Court held that the agency's discretionary decision not to enforce the substantive law was unreviewable under the APA. *Id.* at 828, 837-38. As the Court explained, such decisions "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action . . . best fits the agency's overall policies." *Id.* at 831.

Nonenforcement decisions, the Court observed, generally do not involve the exercise of "*coercive* power over an individual's liberty or property rights," and, accordingly, do "not infringe upon areas that courts often are called upon to protect." *Id.* at 832. Such decisions also "share[] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* For these reasons, the Court found, such decisions have "traditionally been committed to agency discretion,"

19

and Congress, in "enacting the APA[,] did not intend to alter that tradition." *Id.* (internal quotation marks omitted). Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." *Id.*

Here, however, the Department of Homeland Security's decision to rescind DACA is not a "*Chaney*-type enforcement action[]." *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996). For starters, the Acting Secretary did not exercise her discretion in an individual case.[9] Nor did she identify a violation of the INA against which to act, determine whether government resources would be best spent enforcing one violation over another, or decide whether the Department would succeed if it pursued a particular violation. Rather, Acting Secretary Duke rescinded a general enforcement policy in existence for over five years and affecting hundreds of thousands of enrollees based on the view that the policy was unlawful.

Major agency policy decisions are "quite different from day-to-day agency []enforcement decisions." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). Where an agency expresses a broad or general enforcement policy, different considerations than those driving *Chaney*'s presumption are at play.

---

[9] The government correctly observes that an agency's discretionary decision to enforce the law may be unreviewable under § 701(a)(2). *See Speed Mining*, 528 F.3d at 311, 317-18 (holding agency's discretionary decision to enforce substantive law by issuing citations for safety violations was committed to agency discretion and therefore unreviewable). But *Speed Mining* is distinguishable because it involved a discretionary enforcement decision in an individual case.

"As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994).

Accordingly, as courts have recognized, an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review. *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 811-12 (D.C. Cir. 1998) (holding courts had jurisdiction under APA because challenged agency action was a general policy of refusing to enforce provision of substantive law and not a "single-shot non-enforcement decision" (citing *Crowley*, 37 F.3d at 674-76)); *see Kenney*, 96 F.3d at 1123-24 (concluding *Chaney* applies to "individual, case-by-base determinations of when to enforce existing [law] rather than permanent policies or standards" and did not encompass agency's adoption of general policies stating standards agency deemed acceptable to implement statutory goals); *Crowley*, 37 F.3d at 672-73, 675 (*Chaney*'s presumption applies if "agency bases its refusal to enforce in an individual case solely on a legal interpretation without explicitly relying on its enforcement discretion"); *see also Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (holding challenge to agency's interpretation of law and regulations advanced in enforcement policy statement was "not the type of discretionary judgment concerning the allocation of enforcement resources that [*Chaney*] shields from judicial review"); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 767, 773 (D.C. Cir. 1992) (holding *Chaney*'s presumption "is inapplicable

21

or at least rebutted [where plaintiff] raise[d] a facial challenge to the [agency's] statutory interpretation embodied in [a regulation] and d[id] not contest a particular enforcement decision" and citing authority in support). DACA's rescission fits well within this rubric.[10]

The government attempts to distinguish this authority, but its efforts are unavailing. It claims DACA's rescission involved discretionary balancing because it was based on concerns about its legality and "litigation risk," a term that appears to refer to the likelihood the policy would have been invalidated had it been challenged in the *Texas* litigation. But the Rescission Memo doesn't identify the "risk" of litigation as a "consideration" on which the Acting Secretary relied in rescinding the policy. Rather, the Memo relies on the Attorney General's conclusion that DACA needed to be rescinded because it was unlawful.[11] True, the Attorney General's letter also proffers the conclusion that "potentially imminent litigation" would invalidate DACA, as was the case with DAPA in the *Texas* litigation. But we agree with the determination of our district court colleague Judge Bates in his opinion resolving challenges to DACA's

---

[10] Our dissenting colleague contends that decisions from the D.C. Circuit supporting our view that DACA's rescission is reviewable don't explain how they can be reconciled with *Chaney*. Dis. op. at 48-51. We disagree. *See Crowley*, 37 F.3d at 675-77; *Nat'l Wildlife Fed'n*, 980 F.2d at 772-73.

[11] *See* 8 U.S.C. § 1103(a)(1) ("[D]etermination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling [on the Secretary of Homeland Security]."); *see Yanez-Marquez v. Lynch*, 789 F.3d 434, 450 n.6 (4th Cir. 2015) (finding Attorney General's position controlling where Department of Homeland Security and Attorney General had conflicting views about applicability of a legal doctrine).

rescission that this justification "was too closely bound up with [the Attorney General's] evaluation of DACA's legality," *NAACP*, 298 F. Supp. 3d at 234, and thus cuts against *Chaney*'s presumption of unreviewability.

Nor are we persuaded by the government's claim that DACA's rescission rested on the Department's view of the scope of its enforcement authority, not the substantive unlawfulness of the policy. As Judge Bates aptly noted when presented with the same argument, "this strikes the [c]ourt as a distinction without a difference. To say that a particular agency action is 'without statutory authority' is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply." *Id.* at 232. We, like Judge Bates, "fail[] to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision." *Id.* [12]

---

[12] Our dissenting colleague notes that Acting Secretary Duke didn't say in the Rescission Memo "that DACA *must* be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program." Dis. op. at 54. It is true that Acting Secretary Duke wrote only that it was clear DACA "should" be terminated. J.A. 383. Standing alone, however, "should" can express the notion of requirement or obligation. *Should*, Webster's Third New International Dictionary Unabridged (2002) ("used . . . to express duty, obligation, [or] necessity"). Given the Attorney General's evaluation of DACA's legality and the absence of any reference to litigation risk in the Rescission Memo's list of considerations, this use of the word "should" supports our conclusion, *ante*, at 20, 22, that the Secretary rescinded DACA based on her view that the policy was unlawful. Contrary to our dissenting colleague's view, our decision today does not intrude on discretionary prerogatives of the Executive Branch (*see* Dis. op. at 50-52); rather, it "preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons," *NAACP*, 298 F. Supp. 3d at 234.

The government also relies on the Supreme Court's decision in *BLE* as further support for the view that Plaintiffs' claims are unreviewable. But there, the Supreme Court held only that "where a party petitions an agency for reconsideration on the ground of material error, *i.e.*, on the same record that was before the agency when it rendered its original decision, an order which merely denies rehearing of the prior order is not itself reviewable." 482 U.S. at 280 (internal quotation marks, ellipsis, and alteration omitted). The government is correct that the Court also rejected the principle that, if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable," citing as an example a prosecutor's refusal to institute criminal proceedings based on the belief that the law will not sustain a conviction. *Id.* at 283. But *BLE* still does not advance the government's argument.

For one thing, Plaintiffs here filed a timely challenge to the government's *original* decision to rescind DACA. *BLE* doesn't bar review of that type of challenge. Moreover, as the government itself concedes, Appellees' Opening & Response Br. at 19, *BLE* addressed the scope of judicial review in the context of agency non-enforcement action in an individual case. *See Crowley*, 37 F.3d at 675-77 (explaining the basis for distinguishing—for purposes of judicial review—between individual enforcement decisions and implementation of broad enforcement policies). DACA's rescission involves a broad enforcement policy, not an individual decision. [13]

---

[13] We accept that agency action doesn't become reviewable simply because "the agency gives a 'reviewable' reason for otherwise unreviewable action." *BLE*, 482 U.S. at 283. But, as we've explained, DACA's rescission is not such an unreviewable decision. (Continued)

In sum, we hold that Plaintiffs' claims are reviewable.[14]

## III.

### A.

We turn now to the merits and consider first whether the district court erred in granting summary judgment to the government on Plaintiffs' procedural APA claim. The court determined that DACA's rescission was akin to a policy statement and thus was not subject to notice and comment under the APA. *Casa*, 284 F. Supp. 3d at 772. We review this determination de novo. *Children's Hosp. of the King's Daughters, Inc. v. Azar* ("*CHKD*"), 896 F.3d 615, 619 (4th Cir. 2018).

The APA generally requires that agencies provide notice of proposals to create, amend, or repeal a rule[15] and an opportunity for interested persons to comment on the proposal. *See* 5 U.S.C. §§ 551(4)-(5), 553(a)-(c). "Rules issued through the

---

*See NAACP*, 298 F. Supp. 3d at 231 ("[A]n otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion.").

[14] The government has not cross-appealed from the district court's additional determination that all Plaintiffs had standing, *Casa*, 284 F. Supp. 3d at 771, and the parties have not briefed this issue on appeal. Nonetheless, reviewing this issue de novo, *Bostic*, 760 F.3d at 370, we agree with the district court that the individual DACA recipient Plaintiffs have standing to sue. We consequently need not consider whether the other Plaintiffs have standing. *See id.* at 370-71.

[15] The parties don't dispute that DACA's rescission qualifies as a "rule" for APA purposes. *See* 5 U.S.C. § 551(4).

notice-and-comment process are often referred to as legislative rules because they have the force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (internal quotation marks omitted). "[T]he APA provides[, however,] that, unless another statute states otherwise, the notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Id.* at 1203-04 (quoting 5 U.S.C. § 553(b)(A)).

Plaintiffs argue that DACA's rescission required notice and comment under the APA because the Rescission Memo is a legislative rule that mandates how Department officials must act and substantively affects DACA recipients. The government rejects this premise, countering that the Memo is a general statement of policy. We agree with the government.[16]

The critical question in distinguishing between legislative rules and general statements of policy is whether the statement "is of present binding effect; if it is, then the APA calls for notice and comment." *Elec. Privacy Info. Ctr. v. DHS* ("*EPIC*"), 653 F.3d 1, 7 (D.C. Cir. 2011) (internal quotation marks and ellipsis omitted). "[S]ubstantive or legislative rule[s], pursuant to properly delegated authority, ha[ve] the force of law, and create[] new law or impose[] new rights or duties." *CHKD*, 896 F.3d at 620 (internal

---

[16] *Accord Regents*, 908 F.3d at 512-14 (holding DACA's rescission is not a binding rule of substantive law); *NAACP*, 298 F. Supp. 3d at 237 ("[T]he rescission of DACA was exempt from notice and comment as a general statement of agency policy."); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 270-73 (E.D.N.Y. 2018) (dismissing notice-and-comment claims because Rescission Memo is not a legislative rule), *appeals docketed*, Nos. 18-1521, 18-1525, 18-1986 (2d Cir. May 21 & July 5, 2018).

quotation marks omitted); *see Nat'l Latino Media Coal. v. FCC*, 816 F.2d 785, 788 (D.C. Cir. 1987) ("A valid legislative rule is binding upon all persons, and on the courts, to the same extent as a congressional statute."). "To that end, a rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *CHKD*, 896 F.3d at 620 (internal quotation marks and alteration omitted).

By contrast, general statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Vigil*, 508 U.S. at 197 (internal quotation marks omitted). A directive that doesn't establish a "binding norm" and leaves agency officials free to exercise their discretion qualifies as a general statement of policy. *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995) (citing *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987), and *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1015 (9th Cir. 1987)).

The Rescission Memo removes a mechanism under which individuals could receive deferred action but places "no limitations" on other lawful enforcement prerogatives of the Department of Homeland Security. J.A. 384. As the district court observed, *Casa*, 284 F. Supp. 3d at 772, the Memo doesn't curtail the Department's discretion to make deferred action available on a case-by-case or ad hoc basis. Nor does the Memo, by its terms, create "right[s] or benefit[s]" enforceable "by any party." J.A. 384.

Additionally, although DACA was rescinded based on the government's view that the policy was unlawful, the Rescission Memo doesn't bind subsequent Secretaries who

27

might disagree with this reasoning or bar the Department from implementing other deferred action policies in the future. Contrary to Plaintiffs' arguments, the Memo doesn't "replace[] agency discretion with a new binding rule of substantive law," *Mada-Luna*, 813 F.2d at 1014 (internal quotation marks omitted), affecting the rights of people regulated by the Department, *see EPIC*, 653 F.3d at 7 (agency's statement "cast in mandatory language so the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences" qualifies as binding on those subject to it (internal quotation marks omitted)). It therefore falls on the policy "end of the spectrum," *CHKD*, 896 F.3d at 620-21 (internal quotation marks omitted), and thus was exempt from notice and comment under the APA.

### B.

We consider next whether the district court erred in granting summary judgment to the government on Plaintiffs' claim that DACA's rescission is substantively invalid under the APA.

### 1.

The APA requires a reviewing court to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). These "criteria render our oversight highly deferential, with a presumption in favor of finding the agency action valid." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012) (internal quotation marks omitted). This standard, however, "does not reduce judicial review to a rubber stamp of agency action." *Id.* (internal quotation marks omitted). Rather, "we

28

must engage in a searching and careful inquiry of the [administrative] record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.* (internal quotation marks omitted). Where agency action qualifies as "unreasonable as a matter of law, it is likely to have been arbitrary and capricious." *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 n.23 (1989)). "We evaluate [this issue] de novo[.]" *Id.*

To comply with § 706(2)(A), an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The giving of "adequate reasons" for an agency's decision is "[o]ne of the basic procedural requirements of administrative rulemaking." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). In a challenge under § 706(2)(A), "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50; *see Jimenez–Cedillo v. Sessions*, 885 F.3d 292, 299 (4th Cir. 2018) ("[A] reviewing court may not speculate on reasons that might have supported a change in agency position []or supply a reasoned basis for the agency's action that the agency itself has not given." (internal quotation marks and citation omitted)).

An agency satisfactorily explains a decision when it provides "enough clarity that its 'path may reasonably be discerned.'" *Jimenez–Cedillo*, 885 F.3d at 297 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). If the agency provides such an explanation, "we will uphold its decision." *Id.* at 297-98.

29

"But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars*, 136 S. Ct. at 2125.

These principles apply with equal force to a change in agency position. *Jimenez–Cedillo*, 885 F.3d at 298. Thus, in changing policies, agencies "must 'provide a reasoned explanation for the change.'" *Id.* (quoting *Encino Motorcars*, 136 S. Ct. at 2125). "At a minimum, an agency must 'display awareness that it is changing position and show that there are good reasons for the new policy.'" *Id.* (quoting *Encino Motorcars*, 136 S. Ct. at 2126). The agency's explanation must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)). "An 'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez–Cedillo*, 885 F.3d at 298 (quoting *Encino Motorcars*, 136 S. Ct. at 2125).

2.

Plaintiffs argue that DACA's rescission was arbitrary and capricious because the Department of Homeland Security failed to give a reasoned explanation for the change in policy, particularly given the significant reliance interests involved. We agree.[17]

---

[17] Plaintiffs also assert that (1) the district court failed to consider evidence of "bad faith" and "animus" underlying the decision to rescind DACA presented in their complaint and (2) the Department's conclusions about DACA's legality are substantively incorrect. Given our disposition, we decline to address these arguments.

30

As we have explained, DACA was rescinded based on the Department's view that the policy was unlawful. But neither the Attorney General's September 4 letter nor the Department's Rescission Memo identify any statutory provision with which the DACA policy conflicts. *Cf. Encino Motorcars*, 136 S. Ct. at 2127 (rejecting as insufficient agency statement regarding statutory exemption proffered in support of policy change where agency did not "analyze or explain" why statute should be interpreted as agency suggested).

The Attorney General's letter does mention that the Fifth Circuit affirmed the injunction against the DAPA policy on "multiple legal grounds" in the *Texas* litigation, J.A. 379, and the Rescission Memo cites to this ruling. The Fifth Circuit's ruling was based in part on its determination that the DAPA policy likely ran counter to the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Texas*, 809 F.3d at 179. There is no dispute here, however, that "DACA has no analogue in the INA." *NAACP*, 298 F. Supp. 3d at 239 (internal quotation marks omitted). Further, as the Fifth Circuit explained in reaching its conclusion, "DACA and DAPA are not identical." *Texas*, 809 F.3d at 174.

The Attorney General's letter also asserts that DACA suffered from the same "constitutional defects that the courts recognized as to DAPA." J.A. 379. The courts in the *Texas* litigation, however, did not address constitutional claims. And while the Attorney General urged in his letter that his office had a duty to "defend the Constitution" and "faithfully execute the laws passed by Congress," J.A. 379, he does not explain how allowing the DACA policy to remain in effect would violate that duty.

31

The Attorney General's letter and the Rescission Memo also proffer the concern—based on the Attorney General's determination that the DAPA and DACA policies share the same legal defects—that "potentially imminent" litigation would result in a ruling in the *Texas* litigation enjoining DACA. Entirely absent, however, is an explanation why it was likely that the district court in the *Texas* litigation would have enjoined DACA.

Further, the 2014 OLC Opinion outlining the Department's authority to implement the DAPA policy identified "from the nature of the Take Care duty" at least "four general . . . principles governing the permissible scope of enforcement discretion," J.A. 137-38; 2014 WL 10788677, at *5-6, and noted that concerns "animating DACA were . . . consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion," J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.

The point is that the Department had before it at the time it rescinded DACA a reasoned analysis from the office tasked with providing legal advice to all executive branch agencies that supported the policy's legality. Yet the Department changed course without any explanation for why that analysis was faulty. *Cf. Fox Television Stations*, 556 U.S. at 516 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy.").

Nor did the Department adequately account for the reliance interests that would be affected by its decision. Hundreds of thousands of people had structured their lives on the availability of deferred action during the over five years between the implementation of DACA and the decision to rescind. Although the government insists that Acting

32

Secretary Duke[18] considered these interests in connection with her decision to rescind DACA, her Memo makes no mention of them.

Accordingly, we hold that the Department's decision to rescind DACA was arbitrary and capricious and must be set aside.

IV.

We turn next to the district court's rulings (1) granting summary judgment to Plaintiffs on the portion of their estoppel claim pertaining to sharing of DACA applicant information, and (2) ordering the government to comply with the information-sharing policies promulgated in 2012 and enjoining it from altering those policies.

"Equitable estoppel is a well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another." *United States ex rel. Humble Oil & Ref. Co. v. Fid. & Cas. Co. of N.Y.*, 402 F.2d 893, 897 (4th Cir. 1968) (internal footnote omitted). To establish equitable estoppel, "[i]t is only necessary to show that the person [sought to be] estopped, by . . . statements or conduct, misled another to his prejudice." *Id.* at 898 (quoting *United States ex rel. Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938)). As against the government, "estoppel may only

---

[18] The government urges us to consider the June 2018 memorandum from former Secretary of Homeland Security Kirstjen Nielsen belatedly proffered by the government as a basis for upholding DACA's rescission. We decline to do so because the memorandum was not part of the administrative record in this appeal. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).

be justified, if ever, in the presence of affirmative misconduct by government agents." *Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003).

In enjoining the government, the district court determined that estoppel "potentially would apply to any use for immigration enforcement of the information collected . . . during DACA registrations" because "the Government promised not to transfer or use the information gathered from [DACA applicants] for immigration enforcement." *Casa*, 284 F. Supp. 3d at 778.

We disagree with the district court. The government did not make such a promise or suggest in any other way that its policies governing the sharing of information provided by DACA applicants would never change. Rather, the government warned DACA applicants that information they provided could be used for immigration enforcement where criteria for commencement of removal proceedings or referral to law enforcement for a determination whether to commence such proceedings were met. It also warned that its policies governing the sharing of applicant information could be "modified, superseded, or rescinded at any time without notice" and created no "right or benefit." J.A. 1004. In view of these clear and unequivocal warnings, Plaintiffs could not reasonably believe that the information they provided as part of their DACA application would never be used for immigration enforcement purposes. *Cf. Volvo Trucks of N. Am., Inc. v. United States*, 367 F.3d 204, 212 (4th Cir. 2004) ("Equitable estoppel requires reasonable reliance."). Plaintiffs' equitable estoppel claim thus necessarily fails.

34

V.

We turn finally to Plaintiffs' constitutional claims, which were dismissed by the district court. We decline to decide whether DACA's rescission violates the Fifth Amendment's due process and equal protection guarantees under the "well established principle governing the prudent exercise of this [c]ourt's jurisdiction that normally the [c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam). Because we have determined that DACA's rescission violates the APA, we need go no further. *See*, *e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016).

We also decline to decide whether Plaintiffs' Fifth Amendment rights were violated by the policies announced on September 5, 2017, regarding the sharing of personal information from DACA applicants.[19] *McMillan*, 466 U.S. at 51. Our decision today restores DACA to its pre-September 5, 2017, status, rendering a nullity the information-sharing policies announced on September 5. It therefore is unnecessary to address Plaintiffs' constitutional challenge to these policies. *See Veasey*, 830 F.3d at 265.[20]

---

[19] Although the district court found Plaintiffs' due process claims lacked merit, its analysis addressed DACA's rescission, not information-sharing. *Casa*, 284 F. Supp. 3d at 775-77.

[20] Plaintiffs also contend that the district court misapplied Fed. R. Civ. P. 56 by failing to (1) afford them a reasonable opportunity for discovery on their claims, (2) consider or address their statement of material facts in dispute, and (3) view the facts in the light most favorable to them. They allege further that the district court misapplied the APA by granting summary judgment to the government without addressing their (Continued)

## VI.

To sum up: We affirm the district court's rulings that Plaintiffs' claims are justiciable and that DACA's rescission did not require notice and comment under the APA. We reverse the district court's ruling sustaining the rescission of the policy as valid under 5 U.S.C. § 706(2)(A). DACA's rescission is vacated as arbitrary and capricious, and the matter is remanded for further proceedings consistent with this opinion. We reverse the district court's ruling finding Plaintiffs entitled to injunctive relief on equitable estoppel grounds, reverse the grant of summary judgment in Plaintiffs' favor, and vacate the injunction. Because we find it unnecessary to decide Plaintiffs' constitutional challenges to DACA's rescission and the related changes to the Department's policies governing use of information provided by DACA applicants, we vacate the district court's judgment on these issues and dismiss those claims.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*VACATED IN PART,*
*DISMISSED IN PART,*
*AND REMANDED*

---

contention that the administrative record was incomplete and by failing to consider evidence of "bad faith and improper behavior" by government officials. Given our disposition, we find it unnecessary to address these issues.

36

RICHARDSON, Circuit Judge, concurring in part and dissenting in part:

The plaintiffs ask this Court to invalidate the rescission of DACA, a seven-year-old program explained at its inception as an act of prosecutorial discretion. The Majority's opinion grants this request, reasoning that the Department of Homeland Security behaved in an arbitrary and capricious manner by giving what my good colleagues decide are faulty legal reasons for rescinding the discretionary policy.

I disagree with the premise that the Administrative Procedure Act permits this review of the Executive Branch's rescission of DACA. Enforcement discretion lies at the heart of executive power. The Executive may decide to prosecute, or not prosecute, an individual or a group so long as the reasons for that decision are constitutionally sound and the decision does not violate or abdicate the Executive's statutory duties. Here, the Executive's proper exercise of that discretion to rescind DACA is judicially unreviewable under the Administrative Procedure Act, regardless of one's view of the policy questions underlying DACA. To hold otherwise permits the Judicial Branch to invade the province of the Executive and impair the carefully constructed separation of powers laid out in our Constitution.

## I.    Background

The Secretary of Homeland Security is charged by statute with enforcing the nation's immigration laws. *See* 8 U.S.C. § 1103(a); 6 U.S.C. § 202(5). Among those responsibilities is removing individuals subject to removal under federal law. *See Arizona v. United States*, 567 U.S. 387, 396 (2012). "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id*. At each stage of

37

the process—from investigation to execution of a removal order—the Secretary has the discretion to pursue removal or forbear doing so. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

The Secretary has used this discretion to prioritize the removal of certain categories of aliens and deprioritize others. *See, e.g.*, Memorandum from Doris Meissner, Commissioner, Dep't of Justice, Immigration & Naturalization Service, "Exercising Prosecutorial Discretion" 7–9 (Nov. 17, 2000) (deprioritizing the removal of aliens who, for instance, resided in the United States for a long time, had little to no criminal history, and had greater ties to the United States than another country); Memorandum from John Morton, Director, Dep't of Homeland Sec., Immigration & Customs Enforcement, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" 2 (June 17, 2011) (deprioritizing the removal of veterans, minors, elderly individuals, pregnant women, and various other groups). On top of these general, department-wide enforcement policies, individual agents have been empowered to exercise enforcement discretion based on specific circumstances. *See, e.g.*, Meissner Memorandum at 1–2. Just as a highway patrolman has discretion whether to pull over a given driver (and even after pulling someone over, whether to give that person a ticket), immigration agents can weigh individual and country-specific humanitarian circumstances when deciding whether to exercise their prosecutorial discretion. *See* Morton Memorandum at 4.

Relying on this broad enforcement discretion to set enforcement priorities and to guide agents in rendering their individualized enforcement decisions, the Secretary of Homeland Security established the DACA program. Memorandum from Janet Napolitano, Secretary, Dep't of Homeland Sec., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012). DACA authorized agents to grant deferred action[1] to certain people brought illegally to the United States as children. Under DACA, aliens who applied and satisfied certain gateway criteria were "granted" or "denied" deferred action, ostensibly on an individualized, case-by-case basis. *Id.* Even when granted, deferred action could be revoked unilaterally by the Department. *See AAADC*, 525 U.S. at 484–85. The DACA memorandum stated expressly that it conferred upon recipients of deferred action "no substantive right, immigration status or pathway to citizenship." Napolitano Memorandum at 3.

Two years later, the Secretary expanded DACA by loosening some restrictions and extending the period of deferred action from two years to three. Memorandum from Jeh Johnson, Secretary, Dep't of Homeland Sec., "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (Nov. 20, 2014). In the same action, the Secretary also created a new enforcement policy, known as "DAPA,"

---

[1] "Deferred action" means "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14).

extending "deferred action, on a case-by-case basis," to parents of American citizens and lawful permanent residents. *Id.* at 4.

Led by Texas, a coalition of states challenged this new policy in federal court, arguing that DAPA (and the DACA expansion) violated the Administrative Procedure Act as well as the President's Article II duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. The district court preliminarily enjoined DAPA, holding that the Department had "legislated a substantive rule without complying with the procedural requirements under the" APA. *Texas v. United States*, 86 F. Supp. 3d 591, 677 (S.D. Tex. 2015). The Fifth Circuit affirmed the district court, finding that the Department had promulgated DAPA in violation of the APA and that it was "manifestly contrary" to the Immigration and Nationality Act ("INA"). *Texas v. United States*, 809 F.3d 134, 182 (5th Cir. 2015).[2]

The Supreme Court granted certiorari and directed the parties to brief not only the issues decided by the Fifth Circuit, but also whether "the Guidance violates the Take Care Clause of the Constitution, Art. II, § 3." *United States v. Texas*, 136 S. Ct. 906 (2016). But after oral argument, the Fifth Circuit decision was summarily affirmed by an equally divided Court. *United States v. Texas*, 136 S. Ct. 2271, 2272 (2016).

---

[2] In finding DAPA subject to review under the APA, the Fifth Circuit held that deferred action "is much more than nonenforcement." *Texas*, 809 F.3d at 166. The court reasoned that since recipients are conferred "lawful presence" and may receive associated benefits such as driver's licenses and unemployment insurance, deferred action was not an exercise of enforcement discretion. *Id.* at 168, 168 n.108.

In response, the Secretary rescinded the enjoined DAPA program and DACA expansion. Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Rescission of November 20, 2014 Memorandum" (June 15, 2017). And several months later, after Texas threatened to challenge the original DACA policy, the Acting Secretary similarly rescinded DACA. Memorandum from Elaine Duke, Acting Secretary, Dep't of Homeland Sec., "Rescission of the June 15, 2012 Memorandum" (Sept. 5, 2017).

In justifying her decision to rescind DACA, the Acting Secretary referred to the Supreme Court and Fifth Circuit decisions in the DAPA litigation. She also relied on a letter from the Attorney General that asserted that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Id.* at 3–4. The Acting Secretary nonetheless ordered that DACA be wound down in stages over a six-month period. *Id.*

## II.     Administrative Procedure Act Review

The plaintiffs primarily contend that the rescission of DACA violates the APA. Because I find that immigration enforcement decisions are committed to the discretion of the Department, I part with my colleagues and conclude that the rescission of DACA is judicially unreviewable under the APA.[3]

---

[3] The plaintiffs' constitutional claims are, of course, reviewable, and I address them separately below.

41

**A.      Discretionary enforcement decisions are presumptively unreviewable.**

The APA regulates the decisionmaking process of federal agencies.  As such, the statute provides for the judicial review of a "final agency action for which there is no other adequate remedy in court."  5 U.S.C. § 704.  Even so, the statute does not permit review of agency action that "is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  This provision applies to a variety of agency decisions that are unsuitable for judicial review.  *See Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).  One essential category of decisions "generally committed to an agency's absolute discretion" consists of enforcement decisions, both in the civil and criminal arenas.  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Discretion in prosecutorial enforcement is deeply rooted in the Constitution's separation of powers.  *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013); Saikrishna Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521, 537–63 (2005). Indeed, the division of labor with respect to enforcement is among the most critical protections the Constitution affords:  The Executive Branch decides whether and when to begin enforcement actions while the Judicial Branch adjudicates the government's claims.  This division reflects the Framers' recognition that, "in the long term, structural protections against abuse of power were critical to preserving liberty."  *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

Encroachment by the judiciary into enforcement decisions upsets this constitutional balance.  If judges could decide which cases to prosecute, that would

combine the role of prosecutor and judge in one branch of government, seriously risking individual liberty. *See In re United States*, 345 F.3d 450, 454 (7th Cir. 2003); *see also* 1 BARON DE MONTESQUIEU, THE SPIRIT OF LAWS 154 (Thomas Nugent trans., 6th ed. 1792) ("[T]here is no liberty, if the judiciary power be not separated from the legislative and executive."). And if the judiciary could decide which meritorious cases *not* to prosecute, that would improperly divest the President, who unlike judges is elected by the people, of the executive authority that the Constitution affords to protect public safety and enhance public welfare. Thus, in "the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *see also United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). The judiciary's role is to protect individuals by properly adjudicating the charges against them—for example, by dismissing meritless enforcement actions after they are filed. It is normally neither appropriate nor necessary for judges to involve themselves in the decision to bring, or not to bring, enforcement actions.

Though perhaps more often discussed in the criminal context, this broad enforcement discretion also encompasses civil enforcement decisions. *See Speed Mining, Inc. v. Federal Mine Safety*, 528 F.3d 310, 317 (4th Cir. 2008); *see also Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 448 (1979). Indeed, the Supreme Court

has recognized that the concerns that counsel against reviewing criminal enforcement decisions are even stronger in the context of immigration removal decisions. *AAADC*, 525 U.S. at 490 (noting that the "systemic costs" of judicial supervision of enforcement decisions are "greatly magnified in the deportation context"); *see also Mathews v. Diaz*, 426 U.S. 67, 81–82 (1976).

The nature of civil enforcement discretion led the Supreme Court in *Heckler v. Chaney* to hold that an agency's nonenforcement decision was presumptively unreviewable under the APA. In that case, the Food and Drug Administration refused to take civil enforcement action against a class of drug manufacturers and others who produced and distributed drugs used by states to perform executions. The FDA explained its decision not to institute any enforcement action as a product of concerns that it lacked jurisdiction to address the use of drugs in such a way. Yet even if it could, the FDA noted that it would decline to exercise jurisdiction over those manufacturers under its inherent enforcement discretion. The Court found the decision to be presumptively unreviewable under the APA because agency enforcement decisions "involve[] a complicated balancing of a number of factors," like allocating resources and prioritizing policies, that "are peculiarly within [the FDA's] expertise" and are thus generally unsuitable for judicial review. *Chaney*, 470 U.S. at 831; *cf. Wayte v. United States*, 470 U.S. 598, 607 (1985) (noting that the factors that underlie prosecution decisions are of the type that courts are not competent to evaluate).

While civil enforcement decisions are presumptively unreviewable, Congress can overcome that presumption by "circumscrib[ing] agency enforcement discretion" through

44

a substantive statute. *Chaney*, 470 U.S. at 834; *see also id.* at 830 (noting that judicial review is unavailable under the APA if the statute provides "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion"). In this way, Congress retains the ability to restrict the Executive's enforcement discretion. In *Chaney*, to decide whether the FDA was so restricted, the Court examined the relevant statutory provisions and determined that the statutes provided no dictate about when enforcement discretion must be exercised. Since the FDA's enforcement discretion was both statutorily authorized and unconstrained, the Court held that the enforcement decision was not subject to APA review.

*Chaney* also noted, without deciding, two other possible bases for judicial review of civil nonenforcement decisions: if (1) the decision was based "solely on belief that [the agency] lacked jurisdiction"; or (2) an agency expressly adopted a "general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4. The Supreme Court later rejected the first possibility in *I.C.C. v. Brotherhood of Locomotive Engineers*, finding that an agency's reliance on a "reviewable reason" for an otherwise unreviewable discretionary decision did not transform the decision into one subject to APA review. 482 U.S. 270, 283 (1987). The second, which might be thought related to the Take Care Clause, U.S. CONST. art II, § 3, remains a narrow exception theoretically permitting judicial review of agency enforcement decisions in some rare cases.

**B.     The rescission of DACA is not reviewable.**

The decision to rescind DACA is precisely the sort of enforcement decision that is "traditionally . . . 'committed to agency discretion'" and not reviewable by the courts. *Chaney*, 470 U.S. at 832.  None of the recognized exceptions to that limitation apply, and so the rescission of DACA is not reviewable under the APA.

The Supreme Court has recognized that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).  Indeed, executive decisions about immigration enforcement are even further beyond the capacity of judicial review than criminal enforcement decisions, which are otherwise thought to represent the peak of executive discretion.  *AAADC*, 525 U.S. at 489–90.

As a result, with or without DACA, government agents have discretion to grant deferred action in individual cases.  *Id.* at 483–84, 484 n.8.  At least by its own terms, DACA did not eliminate the individualized discretion over enforcement decisions:  it created procedural and substantive scaffolding to guide that discretion.  *See* Napolitano Memorandum at 2.  Rescinding DACA took away the scaffolding but left the underlying core—individualized discretion—untouched.   Thus, insofar as DACA is merely a programmatic enforcement decision, so is its rescission, and both are unreviewable.

The best argument in favor of reviewability is that DACA itself was something other than an enforcement decision.  Once granted, deferred action makes recipients eligible for benefits such as the ability to work legally in the country.  These are subsidiary or collateral benefits that arise from other legal provisions not challenged here.

46

*See* 8 U.S.C. § 1324a(h)(3) ("'[U]nauthorized alien' means . . . that the alien is not at that time . . . authorized to be so employed by this chapter or by the Attorney General."); *see also* 8 C.F.R. § 274a.12(c)(14). Yet the Fifth Circuit found DAPA reviewable because it "would affirmatively confer 'lawful presence' and associated benefits." *Texas*, 809 F.3d at 166. Moreover, some have argued that DACA only masquerades as a program involving individualized discretion and in fact amounts to an entitlement of benefits for the class of aliens who meet the program's threshold criteria. Again, the Fifth Circuit reached a similar conclusion about DAPA. *See id.* at 171–76.

But neither side presses such an argument in this case, and for good reason. The government does not because it claims DACA's rescission is unreviewable. Nor do the plaintiffs, because if they did, their case would be much harder on the merits. DACA relied on identified individualized enforcement as a necessary predicate for the program's existence. *See* The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ____, 2014 WL 10788677, at *13 n.8 (Nov. 19, 2014). If that predicate was false, then DACA was almost surely procedurally and substantively invalid. And that would mean one of the Department's proffered explanations for rescinding DACA—that it was likely unlawful—was valid. Unsurprisingly then, the plaintiffs do not rely on this point, giving us no occasion to consider whether DACA might be anything other than what it claimed to be: a program for a specific exercise of prosecutorial discretion.

No other exception makes the plaintiffs' APA claims reviewable. In particular, nothing in the INA overcomes *Chaney*'s presumption of unreviewability. That presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 832–33; *see also Webster v. Doe*, 486 U.S. 592, 600 (1988) ("§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based[.]"). Nothing in the INA cabins the government's broad immigration enforcement discretion. To the contrary, the INA expansively vests the Secretary of Homeland Security with authority for "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5); *see also* 8 U.S.C. § 1103(a)(1). Our nation's immigration laws do not limit the Secretary's authority to enforce those laws by removing illegal aliens. As a result, the INA does not overcome the presumptive unreviewability of the DACA rescission.

**C.     The generalized nature of DACA does not render its rescission reviewable.**

The Majority adopts a new exception, contending that general enforcement policies, unlike individual enforcement decisions, are reviewable. While this exception has some support in out-of-circuit precedent, I would reject it.

This exception is grounded in dictum from *Chaney*, which left open the possibility of review when an agency adopts a "general policy *that is so extreme as to amount to an abdication of its statutory responsibilities*." *Chaney*, 470 U.S. at 833 n.4 (emphasis added). That is, a general policy that licensed illegal conduct across the board or that categorically excluded a class of individuals from complying with the law might well be reviewable. But nobody here is arguing that the *rescission* of DACA should be so

48

characterized.  Nor could they.  A return to the pre-DACA regime would increase the Department's enforcement of the immigration laws, not abandon it.

A few cases from the D.C. Circuit seem to stretch *Chaney*'s dictum to encompass any "general enforcement policy," as opposed to a "single-shot nonenforcement decision."  *E.g.*, *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994)).  The facts of these cases suggest this principle may be narrower than it appears at first blush.  For example, in some cases, the agency's policy was promulgated as a binding regulation after notice-and-comment rulemaking, which would of course be much more amenable to judicial review than a program like DACA, announced by an informal memorandum.  *See National Wildlife Federation v. EPA*, 980 F.2d 765 (D.C. Cir. 1992).  It also appears that these cases did not involve programs that, like DACA, were expressly predicated on the agency's exercise of individualized discretion.

To the extent that the D.C. Circuit *has* embraced the broad principle that *any* "general enforcement policy" is judicially reviewable, that principle simply cannot be reconciled with *Chaney*.  There, the Supreme Court held unreviewable the FDA's categorical decision not to take enforcement action against a *class of actors* (drug manufacturers, prison administrators, and others in the drug distribution chain).  470 U.S. at 824–25, 837–38.  The fact that the decision was made by the FDA Commissioner made no difference.  *See id.* at 824.  The D.C. Circuit's decisions in this area do not even attempt to explain how this sweeping principle can be reconciled with the facts of

49

*Chaney*. *See, e.g.*, *Crowley*, 37 F.3d at 675–77. Indeed, they often have no reasoning, simply reciting language (often dicta) from earlier circuit cases.

Such a broad exception for "generalized enforcement policies" would also unduly trammel the Executive Branch in carrying out its duties. The head of an agency has every right to exercise enforcement discretion. Standardizing (*i.e.*, generalizing) how agents use their prosecutorial discretion does not alter its character. Whether the Secretary exercises her discretion over an individual case or provides guidance for how discretion should be applied in a class of cases, the decision is unreviewable as one "committed to agency discretion by law." Under the plaintiffs' view, a line agent's decision not to remove a cancer-stricken alien would be unreviewable, but a front-office policy directing line agents to consider whether an alien is terminally ill would be reviewable. That distinction is untenable. *See Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period).

As anyone who has exercised enforcement discretion knows, supervisory control over that discretion is necessary to avoid arbitrariness and ensure consistency. Supervision through generalized guidance that directs the exercise of enforcement discretion cannot transform the enforcement directive into a reviewable action. To find that discretionary enforcement decisions are unreviewable only when inferior officers exercise single-shot enforcement decisions also brushes aside the separation of powers that the Constitution lays out. The President is empowered by Article II to "take Care

50

that the Laws be faithfully executed," and thus may hire officers to assist in these duties. But the constitutional responsibility remains firmly at the President's feet, and therefore, the President remains responsible for his subordinates' exercise of executive power. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010) ("The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them.").[4]

DACA—at least on its face—was just such an unreviewable exercise of supervisory enforcement discretion. It was issued by the Secretary and instructed her subordinates when and how to exercise their discretion, emphasizing that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." Napolitano Memorandum at 2. Such general decisions on enforcement policy, no less than the individual decisions that flow from them, cannot be reviewed by the courts

---

[4] The supervisory use of prosecutorial discretion is not a novel phenomenon. *See, e.g.*, *Treasury Department Circular to the Supervisors of the Revenue* (Sept. 30, 1791), in 9 PAPERS OF ALEXANDER HAMILTON 248–49 (Harold C. Syrett ed., 1965) (advising Treasury officials that "a great relaxation appears unavoidable" in enforcing provisions for seizing spirits without required certificates); Ruth Wedgewood, *The Revolutionary Martyrdom of Jonathan Robbins*, 100 YALE L.J. 229, 278, 339–53 (1990) (describing President Adams's decision to direct the federal prosecutor to enter a *nolle prosequi* for an allegedly mutinous sailor and describing then-Representative John Marshall's floor speech defending the Executive's prosecutorial discretion, *see* 10 ANNALS OF CONG., 6th Cong. 1st Sess. 614–17 (Mar. 7, 1800)); DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS, THE JEFFERSONIANS: 1801–1829, at 5–6 (2001) (noting President Jefferson's "decision to pardon two individuals who had been convicted under the Sedition Act and to quash the pending prosecution of a third"); Letter from Thomas Jefferson to William Duane (May 23, 1801), in 8 THE WRITINGS OF THOMAS JEFFERSON 54, 55 (Paul Leicester Ford ed., 1897) (explaining that whenever President Jefferson should be met with a prosecution under the Sedition law he would treat it as a nullity and order a *nolle prosequi*).

without intruding on the prerogatives of the Executive Branch. And that is necessarily true of DACA's rescission, which merely removed one avenue for exercising individualized discretion. As a result, the rescission is an even less viable candidate for judicial review than is the promulgation of DACA.

**D.     The Acting Secretary's use of legal reasoning in rescinding DACA does not render her decision reviewable.**

The plaintiffs also argue that the Acting Secretary's use of legal reasoning in deciding to rescind DACA makes the decision subject to judicial review. In their view, courts can evaluate legal determinations.

This argument is foreclosed by Supreme Court precedent. The Supreme Court has matter-of-factly explained that there is no "principle that if the agency gives a reviewable reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283 (internal quotation marks omitted). Enforcement decisions are often intertwined with legal reasoning, most obviously "the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction." *Id.* The Court found it "entirely clear" that this "reviewable" proposition cannot render the prosecutor's "refusal to prosecute" subject to judicial review. *Id.*

Efforts to distinguish *BLE* factually cannot avoid its holding. In *BLE*, an agency had refused to reconsider a prior decision on the ground of material error. The Court found that such denials of reconsideration have "traditionally been 'committed to agency discretion by law.'" *Id.* at 282 (quoting *Chaney*, 470 U.S. at 832). As here, the plaintiffs argued that the particular decision before the Court should be reviewable anyway,

52

because the agency had based its refusal on a reviewable issue of law. The Court disagreed and held, as noted, that an unreviewable decision does not become reviewable by virtue of the reasons provided. *Id.* at 280–81. That holding is plainly not limited to cases involving requests for reconsideration. After *BLE*, the scope of permissible judicial review must be determined by the type of agency action at issue and not the agency's reasons for acting.

Just as in *BLE*, there is a nonsensical implication in the plaintiffs' position: that the Executive's discretion is more constrained when it gives a "reviewable" reason for its actions than when it gives no reason at all. If the Acting Secretary was wrong about the likely illegality of DACA,[5] then this might mean that she had provided *no lawful reason* for the rescission. But in the context of the Executive's enforcement discretion, this is perfectly appropriate. The Executive need not explain why it makes particular enforcement and non-enforcement decisions. The Judicial Branch cannot bootstrap review of decisions committed to the discretion of the other branches simply because the reasons provided are of a type that judges consider themselves competent to evaluate.

---

[5] Evaluating the actual legality of DACA requires considering whether and how a court may adjudicate an alleged violation of the Take Care Clause. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). But it also requires addressing the distinct question of whether and how one presidential administration may determine that a previous administration's policy was inconsistent with the constitutional obligation to take care that the nation's immigration laws be faithfully executed. *Cf.* Letter from President George Washington to Sec'y Alexander Hamilton, U.S. Dep't of the Treasury (Sept. 7, 1792) in 32 WRITINGS OF GEORGE WASHINGTON 144 (John C. Fitzpatrick ed., 1939) (writing in 1792 about enforcing unpopular tax laws, President Washington explained that it was his "duty to see the Laws executed: to permit them to be trampled upon with impunity would be repugnant to it").

In any event, the Acting Secretary's rescission memorandum was not a mere statement on the legality of DACA. Instead, the memorandum considered various court rulings as well as the Attorney General's letter before concluding that the "DACA program *should* be terminated." Duke Memorandum at 4 (emphasis added). She did not say that DACA *must* be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program. And in declaring the rescission of DACA after a six-month wind-down period, the Acting Secretary invoked her statutory authority to "establish[] national immigration policies and priorities." *Id*. The Acting Secretary's legal analysis was only one aspect of her reasoning for rescinding DACA, and, of course, a prosecutor may consider beliefs about the law when setting enforcement policy, *see BLE*, 482 U.S. at 283.

For these reasons, I conclude that the plaintiffs' APA claims are not reviewable and would dismiss them.

### III. Constitutional Claims

Because they rule for the plaintiffs under the APA, my colleagues in the Majority decline to address the plaintiffs' constitutional claims. But because I find the plaintiffs' APA claims to be unreviewable, I must briefly address their claims that the rescission of DACA also violates the Fifth Amendment's guarantees of Due Process and Equal Protection.[6] I have little trouble concluding that it did not.

---

[6] Of course, courts may review the exercise of enforcement discretion for compliance with the Constitution. *See Armstrong*, 517 U.S. at 464.

54

**A.** **Due Process**

The plaintiffs' due process claim fails to articulate a constitutionally protected life, liberty, or property interest impacted by the rescission of DACA. And without a protected interest, there can be no unconstitutional deprivation.

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V, cl. 4. A plaintiff raising a due process claim must thus begin by identifying a relevant liberty or property interest. *Wooten v. Clifton Forge Sch. Bd.*, 655 F.2d 552, 554 (4th Cir. 1981). While a government benefit may create such an interest, "a person clearly must have more than an abstract need or desire for [the benefit] . . . . He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

While the plaintiffs argue that DACA created such a claim of entitlement, it did not. On its face, DACA explicitly conferred no protected property or liberty interest, making deferred action putatively available on a discretionary case-by-case basis for two-year periods that could be terminated at any time at the Secretary's discretion. *See* Napolitano Memorandum at 2–3; *AAADC*, 525 U.S. at 484–85. The memorandum itself acknowledged that such rights could be conferred only by "Congress, acting through its legislative authority." *Id.* at 3; *see also Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002) (noting that for a statute to create a liberty or property interest, "it must confer more than a mere expectation (even one supported by consistent government practice) of

55

a benefit").  Having failed to show a protected interest, the plaintiffs' due process claim fails.

The plaintiffs may have serious concerns about our nation's immigration laws and the Department's policy of enforcing those laws.  But an understandable policy concern is not a legally cognizable right.  The rescission of DACA simply does not generate a due process claim.

## B.     Equal Protection

The plaintiffs also argue that the rescission of DACA violates the Fifth Amendment's guarantee of equal protection by targeting a class of aliens for removal based on their race and national origin.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  They have failed to plausibly allege such a claim.

As both parties acknowledge, DACA is an enforcement policy, and so the plaintiffs' challenge to its rescission is necessarily a selective-prosecution claim.[7]  In an ordinary selective-prosecution case, the plaintiffs would have to show that the government's conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose."  *Wayte v. United States*, 470 U.S. 598, 608 (1985); *see also*

---

[7] The plaintiffs assert that they are not claiming selective prosecution "but instead that the Government violated the Equal Protection Clause by rescinding the DACA program in order to target a class defined by race and national origin."  Appellants' Response Brief at 30.  This attempted rewording makes no difference.  The rescission of DACA reset the agency's enforcement policies to no longer channel the exercise of enforcement discretion in a certain way.  As the plaintiffs cannot dispute that the government has the statutory authority to enforce the immigration laws against them, any equal protection claim in this context must necessarily be a selective-prosecution claim.

*Armstrong*, 517 U.S. at 465 (noting that "the decision whether to prosecute may not be *based on* 'an unjustifiable standard such as race, religion, or other arbitrary classification'") (emphasis added) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). There is also a "presumption that a prosecutor has acted lawfully," which can be displaced only by "clear evidence." *AAADC*, 525 U.S. at 489. But the plaintiffs' burden is even higher in this case, because the rescission of DACA only applies to aliens who are in this country illegally. Such an alien "has no constitutional right to assert selective enforcement as a defense against his deportation," with a possible exception for "rare" cases of particularly "outrageous" discrimination. *Id.* at 488, 491.

Here, both DACA and its rescission are, on their face, neutral policies. Logically, the presumption of lawfulness that applies in individual selective-prosecution cases is at least as strong when applied to neutral policies promulgated by senior Executive Branch officials. And the plaintiffs must allege facts that, if true, plausibly suggest that this presumption can be overcome and replaced with an inference of outrageous discrimination.

The plaintiffs have alleged two sets of facts to support their claim of discrimination. First, they argue that since 93% of DACA recipients are Latino, the program's rescission had a disparate impact. A selective-prosecution claim normally requires differential treatment of "similarly situated individuals of a different race." *Armstrong*, 517 U.S. at 465. Yet who is "similarly situated" to DACA recipients except other DACA recipients? Setting aside the closely related and now-rescinded DAPA program, DACA stands alone as a unique exercise of Executive authority. While there

are other deferred action programs (many of which are statutory), none resembles DACA. And the Department rescinded DACA for all recipients, not just for those of a particular ethnicity or nationality.

Second, the plaintiffs rely on presidential campaign tweets, which they claim show invidious animus. But the plaintiffs must create a plausible inference that the same animus allegedly underlying these statements also motivated the Attorney General and the Acting Secretary to take the official government actions at issue. Their complaint simply lacks the connective tissue required to draw that inference. There is also an "obvious alternative explanation" for these officials' actions. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). As the record shows, DACA has long been politically controversial. It "should come as no surprise," *id.*, that well-known policy differences would lead cabinet officials in a new administration to change a controversial government policy. *See* Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Enforcement of the Immigration Laws to Serve the National Interest" 2 (Feb. 20, 2017) (setting out the Administration's new enforcement policies and stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement"). Changes in government policy are perfectly lawful, and for a selective-prosecution claim, we must presume that the Attorney General and the Acting Secretary were motivated by such a lawful purpose. *AAADC*, 525 U.S. at 489. The plaintiffs allege no facts plausibly displacing that presumption.

In short, the plaintiffs have presented no evidence that racial motivations played any part in either the former Attorney General's advice or the former Acting Secretary's decision to rescind DACA. Therefore, I would dismiss the equal protection claim.

## IV.    Information-Sharing Policy

The Majority is correct that the plaintiffs' estoppel claim against the Department is baseless. The availability of equitable estoppel against the government is controversial under any circumstances. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419–21 (1990). The issue remains unresolved by the Supreme Court. *See id.* at 423. And we have recognized that if such a doctrine is ever justified in this context, there must be "affirmative misconduct by government agents." *Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003) (citing *INS v. Hibi*, 414 U.S. 5, 8 (1973)).

In any case, the mere fact that the Department explicitly told applicants that its information-sharing policy "may be modified, superseded, or rescinded at any time" and that the policy "may not be relied upon to create any right or benefit," J.A. 1004, is enough to end our analysis. There was nothing for the plaintiffs to rely on for the proposition that their information was immune from disclosure.

Additionally, even if the doctrine of estoppel applied here, that would not justify the district court's nationwide injunction. *See Gill v. Whitford*, 138 S. Ct. 1916, 1930–31, 1934 (2018); *Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001) (abrogated on other grounds). This potent judicial tool was largely unheard-of until the mid-twentieth century. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 428 (2017). These broad injunctions pose

59

many drawbacks that can quickly outweigh their benefits, particularly when they are overused (and overused repeatedly). Among other things, such injunctions sharpen plaintiffs' incentives to forum-shop while inhibiting the proper ventilation of difficult legal issues by deterring other lower courts from grappling with them. *See id.* at 460–61. Under our decentralized and multifaceted judicial system, judges must scrutinize the scope of the injunctive remedies they fashion. Even assuming a nationwide injunction could be appropriate in some case, an injunction that is limited to the plaintiffs should generally suffice.

*      *      *

We in the Judicial Branch have a narrowly circumscribed role. It is not our place to second-guess the wisdom of the discretionary decisions made by the other Branches. The rescission of DACA was a controversial and contentious decision, but one that was committed to the Executive Branch. For this reason, I respectfully dissent.